**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| VASSIL M. MARINOV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:07-CV-0054 JD |
| | ) | |
| THE TRUSTEES OF PURDUE | ) | |
| UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On September 17, 2007, Plaintiff, Vassil M. Marinov ("Marinov"), filed a Complaint in this Court. [DE 1]. In his Complaint, Marinov names The Trustees of Purdue University ("Purdue") and Alysa Christmas Rollock ("Rollock"), as Defendants. Specifically, Marinov alleges that Purdue failed to make reasonable accommodations and terminated his employment in violation of the Americans with Disabilities Act ("ADA"). [DE 1 at 5]. In addition, Marinov contends that Purdue terminated his employment and treated other non-Bulgarian employees more favorably, in violation of Title VII. [DE 1 at 5]. Next, Marinov contends that Purdue retaliated against him for filing a Charge of Discrimination with the Equal Employment Opportunity Commission, wherein he complained of the aforementioned conduct. [DE 1 at 5-6]. Finally, Marinov additionally alleges that Defendant Rollock violated his due process rights relative to his employment with Purdue. [DE 1 at 6].

On February 25, 2010, the Defendants filed a motion for summary judgment in regard to all of Marinov's claims. [DE 27]. On May 17, 2010, Marinov filed a response in opposition. [DE 38]. On June 1, 2010, the Defendants filed a reply. [DE 40].

1

Also on June 1, 2010, the Defendants filed a motion to strike several exhibits attached to Marinov's response brief, arguing primarily that the documents were not properly authenticated. [DE 41]. On June 15, 2010, Marinov filed a response in opposition. [DE 45]. In addition, on the same day, Marinov filed a motion for leave to file supplemental exhibits, offering to supplement his original exhibits with affidavits of authenticity. [DE 44]. The Defendants did not respond to Marinov's motion for leave, nor did they file a reply in support of their motion to strike.

On June 3, 2010, this case was reassigned to the undersigned for all purposes. [DE 43].

## I. Facts

The following facts are viewed in the light most favorable to the nonmovant, Marinov. Where facts are contested, the Court has so indicated.

On May 5, 1998, Marinov, who is Bulgarian, began working full time as a Service Worker III in the Purdue Memorial Union ("PMU") at Purdue University. (Marinov Dep., DE 39-1 at 2). Marinov's job responsibilities consisted of custodial duties within the PMU, and he, like the other PMU service staff, were supervised by Michelle McBrite ("McBrite"), the PMU Facilities Manager. (McBrite Decl., DE 29-2 at 2). Marinov asserts that all service workers who he works with are non-Bulgarian and non-disabled. (Marinov Aff., DE 39-13 at 3). Initially, from 1998 to February 2004, Marinov was assigned to clean "The Oasis" area. (Marinov Dep., DE 39-1 at 3). However, in February 2004, Marinov was reassigned to the supermarket area and west stairs. (Marinov Dep., DE 39-1 at 3-4).

In the new areas, Marinov was required to work with different cleaning chemicals than those used to clean The Oasis. (Marinov Dep., DE 39-1 at 4). Marinov contends that these new, "Clean on the Go," chemicals, caused him to have chemical allergies and injuries. (Marinov

Dep., DE 39-1 at 5). In particular, Marinov asserts that these products caused him difficulty breathing and gave him a general feeling of weakness. (Marinov Dep., DE 39-1 at 5). Because of these issues, Marinov states that he began asking McBrite and others if he could use the cleaning chemicals that he used previously, but his requests were denied. (Marinov Dep., DE 39-1 at 5).

In March 2004, Marinov was issued formal disciplinary warnings for sleeping at work on two occasions. (McBrite Decl., DE 29-2 at 3). Marinov claims that he was not sleeping but had, instead, suffered from a chemical reaction that caused him to collapse and fall down unconscious. (Marinov Dep., DE 39-1 at 5). Marinov asserts that the "Clean on the Go" products were the cause of his alleged injury. (Marinov Dep., DE 39-1 at 5).

As a result, Purdue advised Marinov to see his family physician, Dr. Scott Miethke, in regards to his alleged reactions. (Marinov Dep., DE 39-1 at 5; McBrite Decl., DE 29-2 at 3). On March 8, 2004, Dr. Miethke referred Marinov to Dr. Carl Griffin, an occupational health physician, for further assessment. (Marinov Dep., DE 39-1 at 6; McBrite Decl., DE 29-2 at 3, 10-11). On April 8, 2004, Dr. Griffin issued a report that was inconclusive regarding the cause of Marinov's reactions but, nevertheless, advised that Marinov return to "modified work with no use of Clean on the Go" products, and to have a recheck in two (2) weeks. (Marinov Dep., DE 39-1 at 7, 20-21). Marinov contends that Purdue required him to continue working with the Clean on the Go products, although McBrite would argue otherwise. (Marinov Dep., DE 39-1 at 7; McBrite Decl., DE 29-2 at 3). On June 4, 2004, Marinov saw Dr. Griffin a second time, who opined again that Marinov should stop working with any chemical or chemical fumes. (Marinov Dep., DE 39-1 at 7). Dr. Griffin gave notice of Marinov's new restrictions directly to Purdue,

and thereafter, Marinov received a telephone call from McBrite who told Marinov to stop going to work because they received the documentation that Marinov was restricted from working with any chemical. (Marinov Dep., DE 39-1 at 8). As a result, Marinov did not work for four (4) months. (Marinov Dep., DE 39-1 at 8).

On October 10, 2004, Marinov filed a grievance regarding Purdue's response to his alleged chemical reactions. (Marinov Dep., DE 39-1 at 8-9). Marinov believed that he could return to work, but just not use Clean on the Go products. (Marinov Dep., DE 39-1 at 9). On October 11, 2004, Dr. Miethke released Marinov to return to work but advised that Marinov needed to "avoid Clean on the Go products until further notice." (McBrite Decl., DE 29-2 at 13; Marinov Dep., DE 39-1, at 8, 22). Thereafter, on October 18, 2004, Marinov received a response from Bob Mindrum, the Director of PMU, stating that because Marinov was "cleared to return to work by [his] physician, . . . with restrictions," then Marinov could return to work on October 20, 2004, and that different chemicals would be provided for him to use. (Marinov Dep., DE 39-1 at 8-9, 23).

On October 20, 2004, Marinov returned to work in the supermarket area. (Marinov Dep., DE 39-1 at 9-10). From October 2004 to March 2006, Marinov was permitted to use alternative chemicals and suffered no chemical reactions or injuries. (Marinov Dep., DE 39-1 at 9-10). Yet, during that time, in July 2005, Marinov was warned for sitting down in a dark office while he was supposed to be cleaning. (McBrite Decl., DE 29-2 at 3). Marinov claimed that his actions were due to a chemical allergy, even though he was no longer using Clean on the Go cleaning products. *Id*. Also during this time frame, on February 11, 2006, McBrite issued Marinov a letter indicating that he was committing several unsanitary food safety violations. (McBrite

4

Decl., DE 29-2 at 5, 15). Marinov was warned that his work performance needed to immediately improve or disciplinary steps would be taken. *Id.*

In March 2006, the PMU cleaning department was reorganized and the cleaning assignments were changed. (McBrite Decl., DE 29-2 at 3-4). Shortly before the change was implemented, all personnel, including Marinov, were provided descriptions of the new cleaning assignments and work areas, and were permitted to submit their top three choices of assignments. (McBrite Decl., DE 29-2 at 4). After speaking with his assistant manager, Jason Gant, Marinov indicated that he wanted to work as a floor scrubber (or "Floor Care") and work in the Rec Center because Gant and Marinov believed that these assignments would accommodate Marinov's restrictions. (Marinov Dep., DE 39-1 at 10-11, 25). Instead, Marinov was assigned to his same shift as a "relief worker" in Pappy's and the kitchen area. (Marinov Dep., DE 39-1 at p. 10; McBrite Decl., DE 29-2 at 4). A non-Bulgarian, non-disabled PMU service worker, Mr. Terry Hunley, was given the night shift assignment that Marinov preferred to work. (Marinov Aff., DE 39-13 at 2). Of the thirteen PMU service workers that submitted preferences, four employees, including Marinov, received assignments other than the ones they expressed interest. (McBrite Decl., DE 29-2 at 4).

On February 27, 2006, Marinov informed McBrite that he could only work the Floor Care and Rec Center positions due to his chemical allergies, and was concerned about his new assignment. (Marinov Dep., DE 39-1 at 25). McBrite informed Marinov that he was not selected for and would not be allowed to work the Floor Care or Rec Center assignments because the positions would now require working with chemicals that Marinov was not able to use. (Marinov Dep, DE 39-1 at 24). McBrite clarified that the only position that would reasonably

accommodate Marinov's restriction to avoid Clean on the Go products was the 'relief position' that he was assigned. *Id*. In his relief position, he would be covering all areas during other employees absences and days off, but he would be allowed to continue using the GP Forward Chemical which he had been using in the supermarket area without any problems. *Id*. She also advised Marinov that if he was starting to experience new problems with different chemicals, such as the GP Forward, then he would need to provide medical documentation concerning the new limitations, because Purdue's current documentation only stated that Marinov could not use Spartan Clean on the Go products. *Id*.

Thereafter, on March 6, 2006, Marinov sent McBrite an email indicating that he could not work in areas where employees from prior shifts had used Clean on the Go products because he would still suffer an allergic reaction. (Marinov Dep., DE 39-1 at 13, 25-27). McBrite sent Marinov an email requesting updated medical documentation regarding Marinov's chemical allergies, explaining that Purdue's records only restricted Marinov from using Clean on the Go products. (McBrite email, DE 39-10 at 2-3). McBrite also informed Marinov that two (2) other positions were vacant, but that they would require use of Clean on the Go products. *Id*. McBrite reiterated that the reason Marinov was given the relief work position was because he would be allowed to use the GP Forward chemical in any area he was assigned to fill. *Id*.

On March 8, 2006, Marinov provided Purdue with a note from Dr. Miethke documenting Marinov's severe Chemical Respiratory Hypersensitivity and advising that Marinov should not be exposed to chemical fumes in confined areas. (Marinov Dep., DE 39-1 at 28).

On March 20 and 21, 2006, Roderick Butcher, a Human Resource Specialist, provided McBrite and Jason Gant with Purdue's request (to be directed to Marinov's health care

providers) to clarify Marinov's medical problems. (Butcher email, DE 39-11 at 2). Mr. Butcher acknowledged that Marinov's work assignments were in compliance with his restrictions to only use GP Forward products; yet, if something else was causing Marinov's problems, then Purdue needed to know what chemicals Marinov could not come into contact with or needed clarification on the maximum concentration levels that Marinov could be exposed to. *Id*.

On March 21, 2006, Marinov reported to work and presented a note from Dr. Miethke requesting that Marinov be excused from working in Pappy's and the kitchen due to chemical hypersensitivity. (Marinov Dep., DE 39-1 at 29; McBrite Decl., DE 29-2 at 17). Marinov also emailed McBrite and requested that he be given the available assignment of "Vila Part," which he thought he could work without experiencing any allergy problems. (Marinov email, DE 39-10 at 2).

The next day, on March 22, 2006, McBrite requested a meeting with Marinov to obtain the new medical documentation from March 21. (McBrite Decl., DE 29-2 at 5). On March 27, 2006, McBrite and Butcher met with Marinov and requested that he sign a medical release so that Mr. Butcher could learn more about Marinov's medical restrictions. (McBrite Decl., DE 29-2 at 5, 19). Marinov indicated that he would think about whether to sign the medical release. *Id*. In addition, Marinov was provided with a list of questions by Mr. Butcher that were to be delivered to Marinov's doctor concerning Marinov's allergies and exposure limitations to chemicals. *Id*. Marinov explained that he only experienced allergic reactions to certain chemicals that were used in Pappy's and other kitchens in PMU. *Id*. Because Marinov could not identify the chemicals by name, he agreed to show McBrite the chemicals that were causing him problems, and then identified only the Eco-Lab family of chemicals that were bad for his health.

*Id.*

As of March 31, 2006, McBrite did not receive the requested medical information, so she and Amy Boyle, another Human Resource Specialist, met with Marinov and requested that Marinov see a doctor at the Regional Occupational Care Center so that Purdue could better assess Marinov's alleged chemical reactions. (McBrite Decl., DE 29-2 at 6). Despite these meetings, Marinov did not comply. (McBrite Decl., DE 29-2 at 6).

On May 19, 2006, McBrite informed Marinov that he would not be permitted to return to work until Marinov provided specific medical documentation from Dr. Griffin regarding Marinov's claimed chemical sensitivity and the specific accommodations necessary. (McBrite Decl., DE 29-2 at 6, 21). This decision was based upon President Jischke's response that the additional health information was needed before Marinov would be allowed to work. *Id.* Marinov was instructed to schedule a visit with Dr. Carl D. Griffin by June 1, 2006, so that Purdue could "be able to decide [Marinov's] work status," and if he failed to schedule the appointment, then his "employment would be terminated." *Id.*

On June 12, 2006, Marinov sought treatment from Dr. Mark Farber at the Indiana Occupational Lung Center who indicated that Marinov could immediately return to work but should not work around any Clean on the Go products and should not work near Pappy's or the kitchen area. (Marinov Dep., DE 39-1 at 30). Also on June 12, following a visit with Marinov, Dr. Griffin reported that Marinov does not need to be prohibited from using chemicals, but recommended that Purdue make Personal Protective Equipment ("PPE") available for Marinov's use when exposed to chemicals. (McBrite Decl., DE 29-2 at 6, 23). Dr. Griffin noted that this could include a PAPR or an NPR respirator and goggles. *Id.* On June 23, 2006, however,

Marinov provided Purdue with a note from Dr. Miethke stating that he could not wear a respirator because it would increase his dyspnea. (Dr. Miethke Letter, DE 39-12 at 2).

On June 23, 2006, Marinov attempted to change shifts with a willing employee who worked in Marinov's old position in the supermarket area. (Marinov Dep., DE 39-1 at 14-15, 32). Marinov also informed McBrite that he could work in the Pizzeria without a problem, but Marinov received no response to his requests. *Id*.

On August 15, 2006, McBrite informed Marinov of Purdue's receipt of the PPE and instructed him to return to work on August 19, 2006. (McBrite Decl., DE 29-2 at 7). The same day, August 15, Marinov filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Purdue failed to reasonably accommodate his disability of having reactions to cleaning products, and alleging that Purdue engaged in national origin discrimination by not giving Marinov another assignment or position based on his being Bulgarian. (Marinov's EEOC Charge, DE 29-3 at 2).

On August 19, 2006, Marinov returned to work but was only able to wear the PPE for a few seconds before suffering from shortness of breath and chest pains. (McBrite Decl., DE 29-2 at 7). As a result, Marinov was transported to the emergency room for treatment. (Incident Report, DE 39-4).

Marinov next reported to work on August 23, 2006, and was again assigned to the kitchen area. (McBrite Decl., DE 29-2 at 7). Marinov refused to work in the area, and instead, requested vacation. (McBrite Decl., DE 29-2 at 7). His request was denied due to the time he had previously been out of work. *Id*. Marinov then requested leave under the FMLA, and Purdue supplied Marinov with the appropriate FMLA leave certification form. *Id*. Purdue

ultimately denied the request, because Marinov did not provide adequate information to certify the request. *Id.*

On August 28, 2006, Marinov again sought treatment from Dr. Farber, who released Marinov to return to work with restrictions against working around Clean on the Go products and against wearing a respirator. (Marinov Dep., DE 39-1 at 31; Dr. Farber rpt., DE 39-2 at 3). Dr. Farber specifically stated that Marinov should only "work in areas where these [Clean on the Go] products are not used." (Marinov Dep., DE 39-1 at 31). Marinov provided the note to McBrite. (Marinov Dep., DE 39-1 at 14).

On August 29, 2006, McBrite sent Marinov another letter requiring Marinov to either return to work, or provide a signed medical release allowing his medical providers to collaborate regarding Marinov's condition and the necessary accommodations, if he insisted that the documentation he provided prevented him from working in his assigned areas. (McBrite Decl., DE 29-2 at 7, 25). McBrite's letter specifically stated: "While you have provided some medical documentation to support your statements, you have consistently refused to engage in the interactive process to resolve the differences between the medical documentation that you provided and that of the occupational health doctor." (McBrite Decl., DE 29-2 at 25). Marinov was encouraged to address with Purdue staff any personal belief that affected his giving a medical release, if any such accommodation was needed. *Id.* In addition, the letter explicitly warned Marinov that he should return to work, or provide the medical release to McBrite, by September 5, 2006—and, a failure to do either would result in his termination. *Id.*

On October 3 and 4, 2006, Marinov was again warned that he must report to work on October 5, 2006 for a full shift, or his employment would be terminated. (McBrite Decl., DE 29-

2 at 8, 28; Butcher email, DE 39-5 at 2). On October 5, 2006, Marinov reported to work. However, Marinov was not dressed in his required uniform and he refused to work. *Id.* Less than 10 minutes after clocking-in for work, Marinov clocked-out and walked off the job. *Id.*

Marinov asserts that his "normal shift" did not require him to work Thursdays. (Marinov Dep., DE 39-1 at 18). Despite clocking-in for work, Marinov claims that, although he reported to work on Thursday, October 5, 2006, he did so only to inform his supervisors that it was his day off. (Marinov Dep., DE 39-1 at 18). Marinov contends that, for this reason, he refused to work on October 5, 2006. Marinov then submitted an internal complaint alleging discrimination and harassment. (Rollock Decl., DE 29-4 at 3-4; Marinov's discrimination complaint, DE 29-4 at 21-23).

On October 6, 2006, McBrite wrote Marinov summarizing the events of October 5 and informed McBrite that his employment was terminated on account of his actions. (McBrite Decl., DE 29-2 at 8, 28).

On October 9, 2006, Marinov submitted a grievance concerning his termination. (Rollock Decl., DE 29-4 at 3-4; Marinov's grievance, DE 29-4 at 24-27). Marinov asserts that Purdue did not follow its progressive disciplinary plan relative to absences, and that he is not "aware of other service workers who worked at Purdue Union who did not show up to work, but were nevertheless not terminated." (Marinov Dep., DE 39-1 at 19, 34-39).

In October 2006, Alysa Rollock, Vice President for Human Relations, received Marinov's October 4 complaint and October 9 grievance. (Rollock Decl., DE 29-4 at 3-4). Consistent with Purdue's procedures for resolving discrimination complaints, Rollock designated Gina Kerr ("Kerr"), Assistant Director for Equity in Hiring, as an investigator for Marinov's

filings. (Rollock Decl., DE 29-4 at 4). On November 17, 2006, following an investigation, which included an interview of Marinov, Gant, McBrite and others, Kerr submitted a determination that the evidence did not support a finding of either discrimination or harassment. (Kerr Decl., DE 29-5 at 3).

On February 6, 2007, Employee Relations Consultant, Kathy Peters, sent Marinov a letter stating that a hearing regarding his grievance was scheduled for February 12, 2007. (Peters Letter, DE 39-6 at 2-3). However, Peters' letter stated that despite efforts to do so, Purdue was unable to obtain an interpreter for the hearing. (Peters Letter, DE 39-6 at 2-3). On February 12, 2007, Marinov arrived at the hearing with his wife, Veneteka, whom he planned to use as an interpreter. Although Marinov was entitled to have a support person present with him (Rollock Decl., DE 29-4 at 17); Purdue would not permit Veneteka to attend the hearing or to serve as an interpreter because Marinov did not designate her as "an advisor" prior to the hearing, and because Purdue had allegedly identified an interpreter who could provide services at a later date, but Marinov refused to have the hearing on the date when the interpreter was available. (Grievance Committee Memo, DE 39-7 at 2). As a result, Marinov did not participate in the hearing. *Id.*

Thereafter, on December 1, 2006, Rollock concurred with Kerr's assessment and sent correspondence regarding her conclusions to Marinov. (Rollock Decl., DE 29-4 at 4). Finally, on February 21, 2007, Purdue President, Martin C. Jischke, issued a letter concurring with the committee's determination to uphold Marinov's termination. (Jischke Letter, DE 39-8 at 2).

In addition to these facts, Marinov attests, without further detail or record support, that unlike other identified service workers who were not Bulgarian and not disabled, he was: (1) not

given the opportunity to discuss his evaluations with his supervisor before they were finalized; (2) "rarely allowed" to work holidays and earn better pay despite his request to do so; (3) not allowed to use the computers in the computer lab on his personal time; and, (4) not given the assistance of other employees to help complete his duties in an area where he could not work. (Marinov Aff., DE 39-13 at 3-4).

## II. Defendants' Motion to Strike [DE 41]

On June 1, 2010, the Defendants filed a motion to strike several exhibits attached to Marinov's response in opposition to summary judgment. In the motion, the Defendants assert that the challenged documents were not properly authenticated. [DE 41]. On June 15, 2010, Marinov filed a response in opposition. [DE 45]. In addition, Marinov filed a motion for leave to supplement his exhibits, offering affidavits which provide testimony as to the authenticity to several of the challenged documents. [DE 44]. The Defendants did not respond to Marinov's motion to amend, nor did they file a reply in support of their motion to strike.

In ruling on the Defendants' summary judgment motion, the Court considers evidence that would be admissible if offered at trial. Fed. R. Civ. P. 56(e)(1); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 371 n.6 (7th Cir. 1997) (declining to consider hearsay evidence in ruling on a motion for summary judgment).

To begin, even if the Court considers all of the documents submitted by Marinov, summary judgment is still appropriately entered in the Defendants' favor. As such, the Court could simply deny the Defendants' motion because the summary judgment ruling is unaffected by consideration of the matters to which the Defendants sought to strike. *See May v. Gale Tschuor Co., Inc.*, No. 2:08-CV-172, 2010 WL 1837769, at *7 (N.D.Ind. May 5, 2010) (denying

the defendant's motion to strike as moot because the defendant was entitled to summary judgment notwithstanding the plaintiff's unsupported assertions). Regardless, the Court will briefly address the motion on the merits.

The Defendants challenge eleven of Marinov's supporting documents as unauthenticated and lacking a proper foundation. Fed. R. Evid. 901(a) states, "[t]he requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Further, when evidence is offered through exhibits on a summary judgment motion, those exhibits "must be identified by affidavit or otherwise be admissible." *Powers v. Dole,* 782 F.2d 689 (7th Cir. 1986).

Marinov responds in two ways. First, Marinov notes that several of the documents at issue are documents obtained from the Defendants in discovery. As such, Marinov argues, correctly, that the documents are implicitly authenticated. *See U.S. v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D.Ind. 1995).

Second, in his motion for leave to file, Marinov offers to supplement the record with supporting affidavits from the makers of the challenged documents in order to establish their authenticity. Notable in this regard is the Defendants' lack of response in opposition. An adverse party shall have fifteen days after service of a motion in which to serve and file a response. N.D.L.R. 7.1(a). Failure to file a response within the time prescribed may subject the motion to summary ruling. *Id.* As a result, the Court finds that allowing Marinov to supplement the record under these circumstances is proper.

In light of all of the above, the Court **GRANTS** Marinov's motion to amend and supplement his exhibits, [DE 44], and **DENIES** the Defendants' motion to strike. [DE 41].

14

Accordingly, the documents attached to Marinov's motion for leave are properly considered by the Court in ruling on the motion for summary judgment.

### III. Defendants' Motion for Summary Judgment [DE 27]

**A. Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). To establish a genuine issue of fact, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, not "simply show that there is some metaphysical doubt as to the material

facts." *First Nat'l Bank of Cicero v. Lewco Secs. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

"It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper–even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (holding that a failure to prove one essential element "necessarily renders all other facts immaterial") (quoting *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994). A court must avoid the temptation to "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770; *Waldridge*, 24 F.3d at 920. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

**B. Marinov's ADA Claim**

Title I of the ADA prohibits certain employers, including the States, from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 360-61 (2001); *Brettler v. Purdue Univ.*, 408 F.Supp.2d 640, 650-51 (N.D.Ind. 2006); *Sissom v. Purdue Univ.*, 2006 WL 897572, *7 (N.D.Ind. 2006). To this end, the Act requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A). *See Garrett*, 531 U.S. at 361; *Sissom*, 2006 WL 897572 at *6. It is under Title I of the ADA that Marinov argues that he is entitled to relief against Purdue[1] (DE 38 at 3).

However, the Eleventh Amendment presents a hurdle for Marinov's ADA claim. The Eleventh Amendment to the Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. If properly raised, the amendment bars actions in federal court against a state, state agencies, or state officials acting in their official capacities. *Ind. Prot. and*

---

[1]Relative to his ADA claim, Marinov sues Purdue, and not Rollack. In fact, Marinov's only claim against Rollock is for an alleged due process violation under 42 U.S.C. § 1983. Marinov's response in opposition to summary judgment confirms the allegations made in his Complaint.

*Advocacy Servs. v. Ind. Family and Soc. Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (internal citations omitted)); *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 694-95 (7th Cir. 2007)

There are three principal types of exceptions to the Eleventh Amendment's bar. *Ind. Prot. and Advocacy Servs.*, 603 F.3d at 371 (citing *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.,* 222 F.3d 323, 337 (7th Cir. 2000)). First, a state may waive immunity by consenting to suit in federal court. *Ind. Prot. and Advocacy Servs.*, 603 F.3d at 371. Second, Congress may abrogate the state's immunity through a valid exercise of its powers under recognized constitutional authority, such as by later constitutional amendments. *Id.* Third, under *Ex parte Young,* 209 U.S. 123, 159-60 (1908), a plaintiff may file "suit[ ] against state officials seeking prospective equitable relief for ongoing violations of federal law . . .". *Id.*

Marinov presents no evidence and makes no argument that Purdue has consented to suit in federal court. And, Marinov acknowledges that Congress did not validly abrogate the State's immunity relative to Title I of the ADA, and therefore the Eleventh Amendment bars him from bringing suit against Purdue for money damages, as held in *Garrett*. To this, the Court agrees. *Garrett*, 531 U.S. at 361 (holding that Congress did not validly abrogate the States' sovereign immunity, and thus private individuals cannot recover money damages from a State for a violation of Title I of the ADA); *Kashani v. Purdue University,* 813 F.2d 843, 845 (7th Cir. 1987) ("Purdue is an instrumentality of the State of Indiana, enjoying its sovereign immunity").

As a result, Marinov resorts to the third exception of immunity and pursues only injunctive relief against Purdue under the *Ex parte Young* doctrine (DE 38 at 3). Specifically, Marinov seeks reinstatement or front pay (DE 1 at 7; DE 38 at 3). In opposition, Defendants

argue that Marinov's ADA claim, as pled, is still barred by the Eleventh Amendment.

"[T]he *Ex parte Young* doctrine focuses on the identity of the defendant and the nature of the relief sought, not on the nature or identity of the plaintiff." *Ind. Prot. and Advocacy Servs.*, 603 F.3d at 372. Here, similar to the plaintiff in *Peirick,* Marinov does not contend that he is bringing his ADA claim against a state official in his or her official capacity. *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 694-95 (7th Cir. 2007). Relative to his ADA claim, Marinov has not named any individual state official as a defendant, and he has not asserted that some identified person violated the protections afforded by the ADA. Although the Eleventh Amendment does not thwart claims against officials in their official capacities for injunctive relief, it does "bar all claims against Purdue." *Kashani,* 813 F.2d 848. This is so, because the jurisdictional bar applies regardless of the nature of the relief sought. *See Gleason v. Bd. of Educ. of City of Chi.*, 792 F.2d 76 (7th Cir. 1986) (citing *Pennhurst State Sch. & Hosp. v. Haldermann,* 465 U.S. 89, 100 (1984)).

Additionally, many courts have held that the governing bodies of their state university enjoy the same immunity from suit as the universities themselves. *Peirick*, 510 F.3d at 695. In particular, this Court has previously stated that "[f]or purposes of Eleventh Amendment immunity, no distinction can, should, or will be drawn between Purdue University and its Board of Trustees." *Wasserman v. Purdue Univ.*, 431 F.Supp.2d 911, 915 (N.D.Ind. 2006) (citing *Wellman v. Trs. of Purdue Univ.*, 581 F.Supp. 1228, 1228, n. 1 (N.D.Ind. 1984)). Absent evidence to the contrary, the same is true for this case, and the Court finds that the Board of Trustees of Purdue University is but an agency of the state, which operates the school under state oversight. *See Peirick*, 510 F.3d at 695-97 (citing *Wasserman*, 431 F.Supp.2d 911; *Wellman*, 581

F.Supp. 1228).  Because Purdue and its Board of Trustees are a political arm of the state, they

are immune from suit. *Id*.  As such, Marinov may not proceed against the Board of Trustees even

on his claims for injunctive relief.

Because *Ex parte Young* actions are actions asserted against state officials in their official

capacity and not against a State directly, Marinov's ADA claim for injunctive relief, as plead,

fails to qualify under the *Ex parte Young* exception to Purdue's Eleventh Amendment immunity

defense. Consequently, summary judgment on Marinov's ADA claim is **GRANTED**.

## C.  Marinov's Title VII Claim for Discrimination

Title VII of the Civil Rights Act of 1964 provides that, "[i]t shall be an unlawful

employment practice for an employer. . . to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, . . . or national origin." 42

U.S.C. § 2000e-2(a)(1).  Pursuant to Title VII, Marinov claims that Purdue discriminated against

him based upon his national origin, because similarly situated non-Bulgarian employees were

not terminated and were treated more favorably than he was as to the terms, conditions, and

privileges of their employment.  Marinov's claim for discrimination can proceed under either the

direct method, by proffering direct or circumstantial evidence that national origin discrimination

motivated the employment decisions, or under the indirect, burden-shifting method outlined in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Nichols v. S. Ill. Univ.-Edwardsville*,

510 F.3d 772, 783 (7th Cir. 2007); *Velez v. City of Chi.*, 442 F.3d 1043, 1049 (7th Cir. 2006).

### 1.    Direct Method

Under the direct method of proof, a plaintiff's claim survives summary judgment if he

can demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (citing *Nagle v. Vill. of Calumet Park,* 554 F.3d 1106, 1114 (7th Cir.2009)). Direct evidence would be an admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus. *Id.* Such admissions are rare, and are entirely lacking in this case.

Circumstantial evidence of discrimination, however, is less rare. The Seventh Circuit typically points to three categories of circumstantial evidence in employment discrimination cases: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Darchak*, 580 F.3d at 631 (citations omitted).

Marinov concedes that he does not have such evidence, and must thereby proceed under the indirect method (DE 38 at 9). Because Marinov admittedly does not offer direct or circumstantial evidence of nation origin discrimination under the direct method of proof, the Court considers whether Marinov has provided sufficient evidence under the indirect, burden-shifting method of proof.

### 2. <u>Indirect Method</u>

Under the indirect method of proof, Marinov bears the initial burden of establishing a *prima facie* case of nation origin discrimination. *Velez v. City of Chi.*, 442 F.3d 1043, 1049-50 (7th Cir. 2006). To do so, Marinov must establish, by a preponderance of the evidence, that: (1)

he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees outside of his protected class. *Nagle,* 554 F.3d at 1119; *Velez v. City of Chi.*, 442 F.3d 1043, 1049-50 (7th Cir. 2006). Once the *prima facie* case has been established, the burden of production then shifts to the defendant to show legitimate, nondiscriminatory reasons for its actions. *Velez*, 442 F.3d at 1050. Finally, the burden shifts back to the plaintiff to attempt to show that the defendant's stated reasons are pretextual. *Id*.

### Protected Class Member

Purdue does not dispute that Marinov is of Bulgarian national origin, and thus falls within a protected class for purposes of Title VII. As such, the first prong of Marinov's *prima facie* case is satisfied.

### Legitimate Expectations

Purdue contends that Marinov was not meeting Marinov's legitimate expectations in three ways. First, Purdue notes that Marinov had a history of disciplinary action, throughout his employment at Purdue. For instance, Marinov was twice written up for allegedly sleeping on the job, and was warned for violating sanitation and food safety rules. Second, Marinov failed to provide the medical information requested by Purdue. And third, once medically released to return to work, Purdue contends that Marinov failed to follow instructions.

In response, Marinov disputes that he had fallen asleep on the job, arguing that he had, instead, fallen ill due to a chemical reaction. Marinov does not dispute that he was warned about his violation of health codes, but he argues that he provided Purdue with his doctors' assessments. Importantly, Marinov's primary contention is that his past discipline is not relevant

22

here, because Purdue did not terminate Marinov based on these actions, but rather, he was terminated for absenteeism and failure to return to work on October 5.[2]

The Court agrees with Marinov because the law makes clear that the proper inquiry for determining whether an employee's performance was satisfactory, mandates looking at the employee's job performance at the time of the adverse actions. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). The issue is not the employee's past performance. *Id.*

Here, the evidence shows that Marinov's March 2004 warning for sleeping on the job, July 2005 warning for sitting down on the job, and February 2006 warning for violating food safety rules, were never mentioned as a basis for Marinov's March 2006 'relief worker' assignment, his October 5 termination, or as a basis for denying him any other employment opportunity. Therefore, in reading the facts in the light most favorable to Marinov, these three identified job performance warnings do not keep Marinov from raising a genuine issue as to whether his performance was satisfactory prior to October 5, 2006.

However, relative to the date on which Marinov was terminated, Marinov did not provide a medical release or work his shift on October 5, 2006, as he was instructed to do. Marinov does not deny this fact, which was the reason Purdue gave for his termination. As such, the Court will consider the reason given for Marinov's termination with respect to the pretext analysis. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477-78 (7th Cir. 2010) ("In some cases, though, the issue of satisfactory performance and the question of pretext overlap . . . . [Plaintiff] was not meeting her employer's legitimate expectations if she was insubordinate; insubordination is a

---

[2]The parties' summary judgment briefs only address Marinov's termination as the basis for meeting the *prima facie* case. However, the Court considers Marinov's additional claimed discriminatory adverse actions by Purdue. *See infra* pp. 24-26.

non-discriminatory reason for termination; and [Plaintiff] is similarly situated only to other insubordinate employees."); *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) ("While the question of pretext arises only after a plaintiff has established a *prima facie* case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we can skip over the initial burden-shifting of the indirect method and focus on the question of pretext). Accordingly, the Court continues its analysis of whether Marinov can establish the third and forth elements of the *prima facie* case, and whether he has shown that Purdue's stated reasons are pretextual.

### *Adverse Employment Action*

Purdue does not dispute that Marinov suffered an adverse employment action when he was terminated on October 5, 2006. The Court agrees. *See Maclin v. SBC Ameritech*, 520 F.3d 781 (7th Cir. 2008) (actionable, materially adverse employment actions include termination).

The Court also considers whether further alleged actions of Purdue constitute adverse employment actions. Specifically, Marinov attests that he did not receive his first choice of reassignments during the March 2006 reorganization; was not given the opportunity to discuss his evaluations with his supervisor before they were finalized; was "rarely allowed" to work holidays and earn better pay despite his request to do so; was not allowed to use the computers in the computer lab on his personal time; and, was not given the assistance of other employees to help complete his duties when another employee received help because she worked two jobs and did not have time to complete her assignments. (Marinov's Statement of Gen. Issues, DE 37 at 11-13) (citing Marinov Aff., DE 39-13). Apart from the details that Marinov provides relative to his assignment after the March 2006 reorganization, Marinov's remaining assertions are made

without his providing any details of the circumstances surrounding the employment decisions. Based on this scant evidence, the Court determines whether these employment actions were materially adverse.

Adverse employment actions have been defined broadly in this Circuit; however, an action must be "significant" to be cognizable as discrimination. *Maclin*, 520 F.3d at 787 (citation omitted). That said, not everything that makes an employee unhappy is an actionable adverse action, as an action must involve more than a mere inconvenience or an alteration of job responsibilities. *Id.* The Seventh Circuit has articulated three general categories of actionable, materially adverse employment actions for the purposes of Title VII:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing [the employee] from using [his] skills and experience, so that the skills are likely to atrophy and [his] career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of [his] resent job altered, but the conditions in which [he] works are changed in a way that subjects [him] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment.

*Id.* at 787-88 (citing *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004)).

On this record, Marinov fails to establish that not discussing his evaluations with supervisors, not using the campus computers, and not being provided assistance to do his job assignment, were anything but an inconvenience. Considering the evidence, namely the self-supporting assertions contained in Marinov's affidavit, it is clear that none of these actions involved a change in the terms or conditions of Marinov's employment. Moreover, Marinov has not suggested that he was evaluated under standards that were different than the standards for other employees, or that any of these actions significantly reduced his career prospects, resulted

in diminished pay or benefits, or somehow constituted a material difference in his job responsibilities. *See Crady v. Liberty Nat'l Bank and Tst. Co. of Ind.*, 993 F.2d 132, 135-36 (7th Cir. 1993) (citations omitted). As a result, Marinov has not established that these actions were materially adverse.

Moreover, the Court does not believe that Marinov's mere lateral move to a relief worker and alleged non-assignment to holiday shifts are sufficient to constitute adverse actions, without evidence to support that a "change" of some sort occurred in the terms or conditions of his employment, or that some identified quantitative effect on his pay took place. Nevertheless, viewing the facts in the light most favorable to Marinov, the Court will consider Marinov's reassignment to relief worker in March 2006, termination in October 2006, and denied requests to work holiday hours (on dates unknown) as adverse actions, for purposes of establishing the third element of *prima facie* case.

### Treatment of Similarly-Situated Employees

To sufficiently establish similarly-situated comparators for purposes of a Title VII claim, a plaintiff must show that there is someone, not of his protected class, who is directly comparable to him in all material aspects, such as, whether the employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). The similarly situated inquiry "is a flexible, common-sense comparison based on 'substantial similarity' rather than a strict 'one-to-one mapping between employees,' but still requires 'enough common features between the individuals to allow [for] a meaningful comparison.'"

*Argyropoulos v. City of Alton,* 539 F.3d 724, 735 (7th Cir. 2008) (citing *Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 405 (7th Cir. 2007)). A meaningful comparison is one which serves "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable," here, discrimination. *Id.*

Marinov submits the following facts as comparator evidence: that he did not receive his first choice of reassignments during the March 2006 reorganization and a non-Bulgarian coworker, Terry Huntley, got Marinov's preferred assignment instead; that Marinov's requests to work holidays were refused, but similar requests were granted to non-Bulgarian workers; and, that he was terminated when he did not work on October 5, but other non-Bulgarian employees received progressive discipline for attendance issues.

The facts, as alleged by Marinov, show that Marinov was a service worker at PMU, that service workers held similar custodial duties within the PMU (although assigned areas varied), that the service workers answered to the same supervisors, and that other than Marinov, all service workers were non-Bulgarian and non-disabled. However, for the reasons that follow, Marinov has not identified any similarly situated non-Bulgarian employee given preferential treatment.

As to the March 2006 reorganization, it is undisputed that of the thirteen PMU service workers that submitted preferences, four employees, including Marinov, received assignments other than the ones in which they expressed interest. But, what matters here is that the uncontested facts show that none of the PMU services workers were similarly situated to Marinov. This is so, because as admitted by Marinov, no other PMU service worker suffered from health problems which consisted of allergic reactions to some of the chemicals that the

service workers used.  In particular, Marinov's allergic reactions to Clean on the Go products resulted in his ability to perform very limited assignments, unlike the other service workers. This reason alone distinguishes Marinov from all other PMU service workers; and therefore, distinguishes Purdue's treatment of Marinov in placing him in the "non-preferred" assignment of relief worker.  The relief worker position was the only position, after the March 2006 reorganization, that would reasonably accommodate Marinov's restriction (at the time) to use only GP Forward cleaning products, which he had be using since October 2004 without incident. Although Marinov subjectively believed that other positions would allow him to use GP Forward cleaning products, McBrite notified Marinov that the relief worker position was, in fact, the only position that would accommodate Marinov's restrictions.  Marinov presents no evidence to contest this fact.  As a result, Marinov cannot identify a similarly situated non-Bulgarian, who received preferential treatment in job assignments.

As to Marinov's denied requests to work holidays, Marinov's factual assertions also insufficiently identify any similarly situated comparator.  Marinov has made blanket assertions that he was "rarely allowed" to work holidays; however, other non-Bulgarian employees were chosen to work holidays.  Marinov provides nothing more.  For instance, he does not identify the dates on which he submitted the requests, the procedure followed for submission and review of such requests, the criteria used for the granting or denying of such requests (i.e. seniority, area assigned, etc.), and the number of times in which he made such requests but was denied, and how these numbers compared to the other employees' requests.  Simply put, Marinov's unsupported accusations do not meet his burden of producing some defense to a summary judgment; instead, it creates a false issue, the demolition of which is a primary goal of summary

judgment. *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995).

As to Marinov's termination on October 5, Marinov asserts that he should have received progressive discipline similar to the treatment given to non-Bulgarian PMU employees. The question is whether Marinov and his colleagues engaged in conduct of comparable seriousness, but received dissimilar treatment. *Peirick*, 510 F.3d at 689. Marinov is unable to make this showing.

First, Marinov does not identify any employee as a comparator. Instead, he generally asserts that any employee must have ten unscheduled absences in a twelve month period in order to warrant termination, and therefore he was treated less favorably. This general accusation does not allow for a meaningful comparison. Second, after being medically released to return to work on August 28, 2006, Marinov received three explicit warnings to report to work, as follows: on August 29, 2006, he was explicitly told to return to work or provide a signed medical release by September 5, 2006; on October 3, 2006, he was explicitly warned to report to work on October 5 or have his employment terminated; and, on October 4, 2006, he was again warned that his failure to report to work in his assigned areas for the entire shift on October 5 would result in his termination. Marinov reported to work on October 5, but was not wearing his uniform and left work shortly after he arrived. Regardless of his belief that it was his normal day off, Marinov does not identify any employee who received advance explicit warnings to either provide a medical release or return to work and complete their entire shift, but then ignored those warnings. More generally speaking, Marinov does not identify any employee who received *any* type of explicit warning, and then failed to comply with the warning. As a result, Marinov cannot show that other PMU service workers engaged in comparable conduct, but received

dissimilar treatment.

Consequently, the Court concludes that Marinov has not produced a genuine issue of fact relative to his being treated less favorably than a similarly situated non-Bulgarian employee. Accordingly, Marinov cannot establish a *prima facie* case of national origin discrimination, and summary judgment is proper on Marinov's discrimination claim.

### *Non-Discriminatory Justification and Pretext*

Assuming for argument's sake that Marinov had satisfied his burden to establish a *prima facie* case of discrimination, the Court considers Purdue's non-invidious explanations for its actions, and whether Marinov has presented sufficient evidence to show that the proffered reasons were merely pretextual. *Velez v. City of Chi.*, 442 F.3d 1043, 1050 (7th Cir. 2006).

Here, it is undisputed that Purdue's proffered reason for assigning Marinov to the 'relief worker' position in March 2006, was because it was the only position that would accommodate Marinov's documented medical need to use only GP Forward cleaning products. Further, there is no dispute that Purdue's proffered reason for terminating Marinov's employment was his failure to heed the explicit warnings to return to work on October 5 for his shift.

Marinov can attempt to demonstrate that these explanations are pretextual either directly, by showing that "a discriminatory reason more likely motivated" Purdue's actions, or indirectly, by showing that Purdue's explanations are "unworthy of credence." *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). To show that Purdue's explanations are not credible, Marinov must "point to evidence that they are not the real reasons it fired him, have no grounding in fact, or are insufficient to warrant the termination decision." *Id*. "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Bodenstab v. County of Cook,* 569

F.3d 651, 657 (7th Cir. 2009).  Accordingly, the question for the Court is whether the employer's stated reason was honest, not whether the employer's proffered explanation was accurate, wise, or well-considered.  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (citation omitted).  In addition, pretext is not necessarily established merely when the plaintiff demonstrates that the employer's reason was mistaken. *Id*.

Marinov attempts to show that Purdue's stated reasons for its actions were merely pretext, by arguing that Purdue systematically treated similarly situated non-Bulgarian service workers more favorably.  Marinov alleges that he was not given the same opportunities to discuss his evaluations with his supervisor, work holiday shifts, use the computers, and receive assistance from other employees to complete his tasks.  Yet, the only evidence in the record to support these allegations is Marinov's self-serving statements contained in his affidavit, which rely on absolutely no facts contained in the record.  Here, Marinov's self-serving blanket assertions, which provide no details surrounding the alleged conduct, cannot defeat summary judgment because his statements are completely "without factual support in the record." *See Buie v. Quad/Graphics, Inc*., 366 F.3d 496, 504 (7th Cir. 2004) (citation omitted).

 In addition, nothing in this record allows an inference that Purdue's explanations for Marinov's March 2006 assignment to relief worker, or Marinov's October 2006 termination, were either likely motivated by Marinov's national origin or are unworthy of credence.

As to Marinov's reassignment, the record shows that Purdue accommodated Marinov's work-related restrictions beginning no later than October 2004, and that, his March 2006 assignment was based on those same restrictions— not on Marinov's being Bulgarian.  After Marinov reported that he thought he could work assignments other than the relief worker

assignment, McBrite responded and informed Marinov that no other service worker position would accommodate his allergic reaction to Clean on the Go products. Marinov presents no evidence to the contrary.

In addition, Marinov did not present any evidence calling into question the sincerity of Purdue's non-discriminatory reason for terminating him, namely that he was insubordinate by refusing to provide a medical release or work on October 5, as explicitly warned. While Marinov contends that he repeatedly provided medical documentation to Purdue, he did not comply with Purdue's specific requests. Moreover, Marinov's termination came on the heels of his refusal to work his shift on the date specified for his return, not because he violated the terms of the attendance policy. No reasonable jury could find that his being Bulgarian played some role or motivated Purdue's decision to terminate him, nor could infer that Purdue was dishonest in its reason for doing so.

Marinov has failed to present any evidence to establish that Purdue's justifications were pretextual, and Purdue's summary judgment on Marinov's Title VII discrimination claim based on national origin is **GRANTED**.

## D. Marinov's Title VII Claim for Retaliation[3]

Despite the fact that Marinov cannot establish a claim for discrimination, Marinov's retaliation claim can proceed independently. *See e.g. Sweeney v. West*, 149 F.3d 550, 554 (7th Cir. 1998). Moreover, although Marinov's retaliation claim was not included in his August 15, 2006, EEOC charge of discrimination, the Court determines that the claims set forth in his

---

[3]As previously discussed, Purdue is immune from suit under the ADA; however, the Court notes that the elements of a retaliation claim are identical under both the ADA and Title VII. *See Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998); *Rizzato-Reines v. Kane County Sheriff*, 149 F.Supp.2d 482, 484 (N.D.Ill. 2001).

federal complaint are within the scope of the administrative charge because the retaliation claim is "like or reasonably related to the allegations of the charge or growing out of the charge." *Gawley v. Ind. Univ.*, 276 F.3d 301, 313 (7th Cir. 2001) (citations omitted). No doubt, Purdue had notice of Marinov's allegations of wrongdoing, and it is proper to allow Marinov's judicial complaint to embrace not only the allegations in the administrative charge, but also the resulting retaliation claim for the filing of the charge, which grew out of alleged similar conduct committed by the same individuals. *Id.*; *see McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 482-83 (7th Cir. 1996) (situations involving an alleged retaliation which arose after the charge of discrimination was filed only require a single filing to comply with the intent of the statute because a double filing would serve no purpose except to create additional procedural technicalities).

Under Title VII, it is unlawful for any employer to discriminate against an employee for "oppos[ing] any practice made an unlawful employment practice by [the Act] . . . or because he has made a charge . . . under [the Act]." 42 U.S.C. § 2000e-3(a). More simply put, "[a]n employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII." *Racicot v. Wal-Mart Stores, Inc.,* 414 F.3d 675, 678 (7th Cir. 2005). As with Marinov's discrimination claims, Marinov may proceed under either a direct or indirect method of proof to establish his claim for retaliation. *Id.* at 681.

1.  **Direct Method**

Under the direct method of proof, Marinov must establish that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action subsequent to his participation; and (3) there was a causal connection between the adverse action and the protected

activity. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008); *Metzger v. Ill. State Police,* 519 F.3d 677, 681 (7th Cir. 2008).

### Protected Activity

The parties do not dispute that Marinov engaged in protected activity when he filed his EEOC charge on August 15, 2006, which he did prior to his termination on October 5, 2006. Accordingly, Marinov has established the first element of his retaliation claim under the direct method.

### Adverse Employment Action

The only employment action Marinov asserts was retaliatory was his termination on October 5, 2006. Purdue does not contest that Marinov's termination satisfies this requirement. And, the Court agrees that Marinov's job loss constitutes a materially adverse employment action. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("In the retaliation context, conduct is 'materially adverse' if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.') (citing *Burlington Northern and Santa Fe Ry Co. v. White,* 548 U.S. 53, 68 (2006) (other citations omitted)).

### Causal Connection

The primary issue here is whether Marinov can demonstrate a causal link between his protected activity and Purdue's actions. Marinov may establish such a link using either direct or circumstantial evidence. *Stephens,* 569 F.3d at 787 (citing *Treadwell v. Office of Ill. Sec'y of State,* 455 F.3d 778, 781 (7th Cir. 2006)). Direct evidence of retaliation typically requires an actor's admission of discriminatory animus, but such evidence is predictably rare. *Stephens,* 569 F.3d at 787 (internal citation omitted). A plaintiff may also prevail "by constructing a

convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Id*. (other citations omitted); *see Volovsek v. Wis. Dep't of Agric., Trade and Consumer Protection*, 344 F.3d 680, 689-90 (7th Cir. 2003) (noting that circumstantial evidence, is generally presented in one of three types: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly-situated employees were treated differently; or (3) evidence that the employee did not deserve termination and that the employer's reason for termination is a pretext for discrimination). Here, the Court finds that Marinov's mosaic is "a few tiles short of creating an image of intentional discrimination." *Stephens,* 569 F.3d at 787

To establish the causal connection, Marinov presents evidence of suspicious timing. In particular, Marinov notes that he received a letter requiring him to return to work or provide a medical release, or else face termination, only two weeks after the filing of his EEOC charge. In addition, Marinov notes that he was terminated less than two months after his filing.

However, "[m]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing [is] rarely sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), *clarified on other grounds*, *Treadwell*, 455 F.3d at 781 (circumstantial evidence may be admitted and, if proven to the satisfaction of the trier of fact, support a case of retaliation); *see Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004) ("a temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause."). The mere fact that one event preceded another does little to prove that the first event caused the second, and here, Marinov's supicious timing alone is not enough to reasonably

establish the causal link. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).

Marinov fails to recognize that long before he filed his EEOC charge and received Purdue's August 29 letter, Purdue had sent repeated requests for medical information which were similar to the August 29 request. Specifically, when Marinov first complained that the new 'relief worker' assignment would cause him to suffer allergic reactions to the chemicals that he had to use (even though he was using the GP Forward product that he had been using since late 2004 without incident), Purdue requested updated medical documentation from Marinov on March 6, 22, 27, and 31, and May 19, 2006. In fact, on March 27, 2006, Purdue requested a medical release from Marinov, which was never returned, and Purdue provided Marinov with a list of questions to give to his doctor concerning Marinov's allergies and exposure limitations to chemicals, which was also not returned. And, on May 19, 2006, Purdue's letter advised Marinov that he would not be permitted to return to work until he provided the requested documentation, and that if he failed to schedule the required doctor's appointment, then his employment would be terminated. Again, all of these events, including a threat of termination, occurred *before* Marinov filed his EEOC charge.

Thereafter, on August 15, 2006, Purdue supplied Marinov with PPE, per Dr. Farber's June 12, 2006 release, and instructed Marinov to return to work; but then, Marinov obtained contradictory medical advice that prohibited his use of PPE. Thus, on August 29, 2006, Purdue again sought additional medical information to clarify Marinov's medical restrictions and requested that Marinov sign a medical release; and, for the second time, threatened Marinov with termination for any failure to comply. Thus, although Marinov presents evidence of a close temporal sequence between his filing of the EEOC charge and Purdue's August 29 threat to

terminate him, the evidence here cannot support an inference of discrimination for his engaging in protected activity.

Marinov also argues that he has established a causal connection by demonstrating that Purdue's stated reason for his termination is pretext. The Court has previously rejected this argument, and does so again. *See supra* pp. 30-32. There is no indication that Marinov's termination, which followed on the heals of his insubordination, bore any relation to his filing the EEOC charge. Because no jury could infer intentional discrimination by Purdue, Marinov cannot establish his retaliation claim under the direct method.

## 2. <u>Indirect Method</u>

Under the indirect method of establishing retaliation, the first two elements remain the same as the direct method, *Stephens*, 569 F.3d at 786, which have been established by Marinov in this case. *See supra* pp. 34. However, instead of proving a direct causal link, Marinov must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination. *Stephens*, 569 F.3d at 786-87 (citation omitted). Once Marinov establishes the *prima facie* case under the indirect method, Purdue must articulate a nondiscriminatory reason for its action; and if it does, then the burden remains with Marinov to demonstrate that Purdue's reason is pretextual. *Id*.

Marinov does not attempt to establish a *prima facie* case of retaliation under the indirect method of proof. Wisely so, because even assuming Marinov was satisfactorily performing his job, he cannot establish that he was treated less favorably than a similarly situated employee when he does not specifically identify a single employee who did not engage in protected activity. Thus, no sufficient comparison can be made. Moreover, his pretext argument fails for

the reasons previously detailed. *See supra* pp. 30-32.

Accordingly, the Court concludes that Marinov cannot establish a claim for retaliation under either the direct or indirect methods of proof; and therefore, Purdue's request for summary judgment is **GRANTED**.

### E. Marinov's § 1983 Due Process Claim

Finally, by way of 42 U.S.C. § 1983, Marinov alleges that Defendant Alysa Rollock violated his right to procedural due process as protected by the Fourteenth Amendment of the Constitution of the United States. Specifically, Marinov contends that he had a property interest in continued employment, and that Rollock's failure to secure an interpreter for his grievance hearing violated his due process rights.

In response, the Defendants assert that Marinov's due process claim must fail as a matter of law because Marinov has failed to establish a property right to his employment. The Court agrees.

The Fourteenth Amendment prevents the state from depriving any person of liberty or property without due process of law. *Jeffries v. Turkey Run Consol. School Dist.*, 492 F.2d 1, 4 (7th Cir. 1974). However, the right to due process is applicable only to state action which impairs a person's interest in either liberty or property. *Id.*

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Marinov believes that he had a legitimate expectation of job security rising to the level of a property interest.  Marinov contends that Purdue's progressive discipline policy relative to attendance afforded him "*de facto*" tenure to his position, because these rules limited the Defendants' discretion to terminate his employment unless specific conditions were met.  As such, Marinov argues that he had a "reasonable expectation of continued employment at Purdue so long as he did not violate Purdue's progressive discipline policy."  (Marinov's Response Brief, DE 38 at 19).

Marinov's position is unconvincing.  First, Marinov admits that his employment was not based on a contract for a definite term of employment, and he does not contend that his employment was subject to a "for cause" provision for purposes of termination.  *See Mitchell v. Glover*, 996 F.2d 164, 167 (7th Cir. 1993) ("As an 'at-will employee' the plaintiff clearly had no entitlement to continued employment and thus could be dismissed at any time for any reason."); *Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 589 (7th Cir. 1992) ("an employee whose terms of employment include a 'for cause' type provision may not be terminated without adequate procedural protection.").

Second, Marinov has not presented any evidence to establish "mutually explicit understandings" that Marinov would be guaranteed continued employment. *See id.*; *Smith v. Bd. of Educ. of City of Chi.,* 853 F.2d 517, 522 (7th Cir. 1988).  In that regard, Defendants did not make any statements or commit any actions which would allow Marinov to believe that his employment was guaranteed.  Instead, Marinov argues that Purdue's progressive disciplinary procedures for unexcused absences only allowed Purdue to terminate him after he had ten unscheduled absences in a twelve month period.

However, this argument is flawed because provisions in employee manuals do not create enforceable employment contracts. *Colburn*, 973 F.2d at 589 ("A property interest is not established by general statements in handbooks, appointment documents or elsewhere that an employee will be judged based on some 'criteria.'"). *See also Tri-City Comprehensive Comty. Mental Health Ctr, Inc. v. Franklin*, 498 N.E.2d 1303, 1306 (Ind. App. 1986) ("Employee handbooks are immaterial without an enforceable agreement between the employer and employee of employment for a definite duration.").

More importantly, even if the progressive disciplinary procedures limited Purdue's ability to terminate employees due to excessive absenteeism, Marinov does not produce any evidence to show that Purdue's discretion was so limited after Marinov blatantly refused to comply with his employer's explicit directions to provide a medical release or return to work on October 5. *See Colburn*, 973 F.2d at 589 ("Property interests exist when an employer's discretion is clearly limited so that the employee cannot be denied employment unless specific conditions are met."). Purdue warned Marinov three times that his failure to work on October 5 would be the basis of his termination—which it was. Nothing in the attendance policy relied on by Marinov could fairly be interpreted as promising Marinov that his job was secure, as long as he did not surpass the allowable number of unscheduled absences. *See Campbell v. City of Champaign*, 940 F.2d 1111, 1112-13 (7th Cir. 1991). The policy was not to confer rights, but to warn employees about conduct or circumstances that would result in termination or other adverse personnel action. *Id.* Moreover, even if the policy could be construed as entitling Marinov to progressive discipline, which it did not, the breach would not be a deprivation of property. *Id.* ("[A] contract that creates merely a right to procedure does not create a property

right within the meaning of the due process clause.") (citation omitted).

In sum, Marinov's subjective expectation of continued employment, if any, was purely unilateral, and as such, is insufficient to state a property interest protected by the Fourteenth Amendment. *Smith*, 853 F.2d at 522.  Without a property interest, the issue of what constitutes proper due process need not be addressed.  Therefore, because Marinov did not have a property interest in his employment position at Purdue, his § 1983 claim for violation of the Fourteenth Amendment necessarily must fail as a matter of law, and the Defendants' motion for summary judgment on this claim is **GRANTED**.

### IV.  Conclusion

For the aforementioned reasons, the Court now **GRANTS** Marinov's motion to amend and supplement his exhibits [DE 44], and **DENIES** the Defendants' motion to strike [DE 41]. Additionally, the Court **GRANTS** the Defendants' motion for summary judgment, relative to all of Marinov's claims [DE 27].  Accordingly, the Court **INSTRUCTS** the Clerk to term this case and enter judgment in favor of the Defendants.

SO ORDERED.

ENTERED:   March 29, 2011

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court